UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHEMELIA BURDETT-FOSTER,

            Plaintiff,                                    Case No: 12-14280

vs.                                                             HON. AVERN COHN

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

            Defendant.
_____/

**MEMORANDUM AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (Doc. 23) AND DISMISSING CASE**[1]

**I.  INTRODUCTION**

This is an employment case. Plaintiff Shemelia Burdett-Foster (plaintiff), an African American woman, is suing defendant Blue Cross Blue Shield of Michigan (defendant) over her termination from her employment with Blue Care Network (BCN), a wholly owned subsidiary of defendant. Plaintiff says she was terminated from BCN because of her race and medical disabilities. The second amended complaint (Doc. 18) is in four counts, phrased by plaintiff as follows:

    Count I        Racial Discrimination In Violation Of Title VII Of The Civil Rights Act Of 1964

    Count II       Racial Discrimination Under The Elliot-Larsen Civil Rights Act

    Count III      Retaliation

    Count IV      Unlawful Discrimination And Hostile Work Environment Under The ADA

---

[1] Although originally scheduled for hearing, the Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

Now before the Court is defendant's motion for summary judgment (Doc. 23) on the grounds that plaintiff was terminated for cause. Defendant contends that plaintiff fails to create a genuine issue of material fact that she was retaliated against or subjected to a hostile work environment. The Court agrees. For the reasons that follow, defendant's motion is GRANTED. This case is DISMISSED.

## II. BACKGROUND[2]

### A. Factual Background

Plaintiff began her employment with BCN on July 10, 2000. (Doc. 23-2 at 39, Pl's. Dep. Tr.).

From June 2009 until her termination on January 26, 2011, plaintiff held the position of provider registration specialist for BCN. (*Id.* at 12). Prior to holding this position, plaintiff worked in a number of different positions including as a document support clerk, membership maintenance technician, cash control specialist, and office support clerk. (*Id.*).

In 2011, plaintiff was granted a short-term disability (STD) leave due to her depression. (Doc. 23-20 at 9, STD Approval). When plaintiff returned to work on May 23, 2011, she requested an accommodation which would allow her to use the bathroom frequently. Plaintiff's medical records show that her psychiatrist, Dr. Tariq Abbasi (Abbasi), noted that plaintiff should be allowed to use the bathroom frequently because of the side effects of the medication she was taking. (Doc. 23-20 at 8, Work Excuse). BCN granted

---

[2] Defendant did not follow the Court's summary judgment guidelines by failing to combine its statement of facts and plaintiff's response in a joint statement of material facts.

2

plaintiff this accommodation on a trial basis. (Doc. 23-3 at 44, Pl's. Dep. Tr.; Doc. 23-6 at 7, Walgenbach Dep. Tr.; Doc. 26-5 at 4, Mitchell Email).[3]

After plaintiff returned to work from her STD leave, she was required to receive "telephone training" in case she was needed for backup duties in answering phones. (Doc. 232-4 at 15, Gibson Dep. Tr.). Plaintiff's superiors had previously received telephone training when BCN integrated with defendant, and they were assigned backup telephone duties. The UAW complained that plaintiff did not have as much seniority as her colleagues who were required to take the training, and that she should be required to start training. Therefore, BCN required plaintiff to perform the training as they had done with the other employees. (*Id.*).

Plaintiff testified at her deposition that she completed part of the training, but that she got sick and did not finish. (Doc. 23-2 at 13, Pl's. Dep. Tr.). She could not recall whether she complained that she did not want to answer telephones. (*Id.*).

In July of 2011, Barbara Derian, a BCN director, put a note in plaintiff's file relating to plaintiff expressing that she did not want to answer telephones. The note reads:

> While visiting the PEDM operations, I stopped by to say "hi" to Shemelia [plaintiff]. She started to cry and I asked if she would like to go off the floor and speak with me. I asked if she wanted to go somewhere private. She said "yes" and I took her to the QM library.

---

[3] Internal email correspondence between BCN management and a nurse from CompOne Administrators (CompOne), defendant's third party STD program administrator, show that in September of 2011, BCN decided that it would start tracking the frequency of plaintiff's bathroom breaks and reevaluate in a month whether to continue the accommodation previously given to her. (Doc. 26-5 at 2, Brewer Email). However, plaintiff testified at her deposition that she was always accommodated by being allowed frequent bathroom breaks.

> She told me that she did not want to be on the phones. She was very upset and crying. We discussed if she likes to help people and that phone work was helping people. We also discussed how sometimes we don't have passion for everything we do at work but that if we can put on a service persona for when we are at work, we can be successful. I explained that we need to follow the contract and her seniority requires that she be a phone back up. It is a back up position not full time phones. I was able to calm her down and she returned to the floor.

(Doc. 23-19, Derian Note).

In late July or early August 2011, plaintiff stopped telephone training because she informed her managers that she had a problem with her vocal cords. Plaintiff testified at her deposition:

> Q. I'm showing you what has been marked as Exhibit 10. Okay. So you were asked to go onto the phones, to train on the phones sometime in late summer and then you – did you attend any of that training?
>
> A. I did the basic part of the training, the learning the phones, and I sat with two people to listen to calls. That was it.
>
> Q. And you did not complete the training?
>
> A. No, I didn't.
>
> Q. And you did not complete the training because you represented to the company that you had a vocal cord issue or a speaking problem?
>
> A. Yes. I had this before I was at the training. I had this before the training.
>
> * * * *
>
> Q. Can you explain what the condition was?
>
> A. I lost my voice. I had a – something was wrong with my vocal cord.
>
> * * * *
>
> Q. Okay. So Dr. Stone – Michael Stone writes this letter assessing you and he indicates that you came in with a several-week history of hoarseness and that you noticed this after going to a concert and screaming a lot. What concert?

4

    A.    R Kelly.

(Doc. 23-2 at 43, Pl's. Dep.).

Plaintiff's vocal cord problem was accommodated and her telephone training was postponed. However, after a "few weeks" she was told that she would need to provide documentation supporting her vocal cord problem. (Doc. 23-4 at 15, Gibson Dep. Tr.). She submitted documentation from her physician, Dr. Michael Stone (Stone). In a letter dated August 15, 2011, Stone noted:

> Assessment & Plan: Vocal cord dysfunction. Her exam is entirely normal. She just needs to speak the right way. She likely developed some pain at this concert that resulted in pain with talking. She is able to move her vocal cords normally now but she just cannot sound clear when she does it. I have recommended speech therapy as they will give her some exercises to strengthen her voice and help get rid of the whisper.

(Doc. 23-21 at 3, 8/15/11 Stone Letter).

Based on Stone's letter plaintiff's telephone training was further postponed. However, in late August 2011, BCN sought a second opinion because telephone backup constituted "5-15% of [plaintiff's] daily job functions" and BCN needed "additional assistance on the telephones . . . to cover normal lost time, call volume, lunch time and STD." (Doc. 23-22 at 2, Gibson Email). As such, on August 24, 2011, plaintiff was notified that an August 26, 2011 appointment was scheduled for her by CompOne Administrators (CompOne), defendant's third party STD program administrator, with Dr. Mark Uzansky (Uzansky). (*Id.* at 3, 8/26/11 Appointment Notice). However, on August 25, 2011, plaintiff notified Patricia Brewer (Brewer), BCN's human resources manager that she had previously approved paid time off (PTO) and would be unable to attend the appointment with Uzansky. (Doc. 23-23 at 2, 8/25/11 Email From Plaintiff To Brewer). The appointment

5

was rescheduled with Uzansky for Friday, September 9, 2011. Although plaintiff received notice of the new appointment, *see* (*id.* at 3, 8/30/11 Inter-Office Memo), she failed to attend. The appointment was again rescheduled with Dr. Schwartzenfeld[4] for September 16, 2011. (Doc. 23-24 at 2, Appointment Reminder).

Plaintiff attended the appointment with Schwartzenfeld on September 16. Schwartzenfeld diagnosed plaintiff with "[h]oarseness – dysphonia." (Doc. 23-25 at 3, Schwartzenfeld Letter To CompOne). Schwartzenfeld recommended:

> Patient should have a videostroboscopy[5] to further evaluate her vocal cord function. In addition, I recommend that she maintain her present job and her job training should be postponed until her voice returns to normal.

(*Id.*). Schwartzenfeld noted that plaintiff's prognosis was "good." (*Id.*). In an addendum, Schwartzenfeld stated that plaintiff's training could continue if her voice returned to normal. (Doc. 23-28, Szhwartzenfeld Addendum).

CompOne notified plaintiff on October 11, 2011, that she needed to set up a videostroboscopy with her treating physician, Dr. Stone, "to further evaluate [her] vocal cord function." (Doc. 23-29 at 2, Email Correspondence). An appointment was scheduled with Stone for October 25, 2011, but plaintiff later cancelled the appointment because she claims that she needed a "time card code" to allow her to miss work. Brewer testified at her deposition that she informed plaintiff that she did not need a time card code:

---

[4] Uzansky was not available on this date.

[5] A videostroboscopy "is one of the most practical methods for viewing and recording the motion of the vocal cords during speaking or singing. A digital computer and strobe light are used to make images of the vocal cord vibrations appear in slow motion, so that any abnormal patterns of vibration may be detected." *See* http://www.ent-stl.com/center-for-voice/frequently-asked-questions-about-videostroboscopy.

> Q. Did you ever give her those codes?
>
> A. I informed her that she could get – she didn't need a code for the doctor's appointment.
>
> Q. And why is that?
>
> A. Because she didn't. The leadership was made aware that the expectation was for her to go to the doctor's appointment, as well as the union was also made aware that there would be no issues with her; and whatever issues that she might have, they would come to me and I would handle them.

(Doc. 23-5 at 9, Brewer Dep. Tr.). In addition, plaintiff admitted at her deposition that her union leader told her to use a "miscellaneous code." (Doc. 23-3 at 19, Pl's. Dep. Tr.).

On October 27, the appointment for a videostroboscopy was rescheduled with Dr. Weingarten for November 1, 2011. (Doc. 23-29 at 4, Email Correspondence).

On October 28, plaintiff was issued a disciplinary five-day suspension for insubordination. (Doc. 23-30, Employee Discipline Report). The facts/events section of the disciplinary report states:

> Over the past couple of months, Shemelia Foster has failed [to] keep appointments that has [sic] been scheduled for her through CompOne. Ms. Foster has been very deliberate in being insubordinate by rescheduling, canceling and/or no showing for appointments that have been scheduled through HR and CompOne.
>
> The following are examples of insubordination: failing to pick up the memo from HR outlining her physician 8/26 appointment, Notifying HR in an untimely manner that she had a day off on the day of the 8/26 appointment, No showing when the 8/26 appointment was rescheduled to 9/9, cancelled the 10/21 appointment and failing to show for the 10/25 appointment.

(*Id.*). Further, the discipline report stated that "[a]ny future acts of insubordination will lead to discipline up to and including, termination." (*Id.*).

Plaintiff did not return to work on November 4, 2011, at the conclusion of her disciplinary five-day suspension, nor did she attend the scheduled appointment on

November 1. She went to the emergency room on November 1, 2011 after fainting at her home. She was discharged a few hours later with a diagnoses of depression and dehydration. (Doc. 23-32 at 2, Emergency Dep't Discharge Instructions). Ultimately, Plaintiff called in a STD claim and was granted STD leave until January 10, 2012.

While she was on STD leave, plaintiff attended one speech therapy session, at the request of BCN. In addition, during this time, CompOne received clearance from plaintiff's psychiatrist, Dr. Abbasi, that plaintiff was able to undergo the videostroboscopy. (Doc. 23-36 at 5, Email Correspondence). On December 21, 2011, plaintiff was notified that Dr. Abbasi had cleared her for the videostroboscopy and that plaintiff should schedule an appointment with Dr. Stone. (*Id.*).

Plaintiff responded to CompOne's administrator saying that, "[d]ue to my religion the videostroboscopy isn't scheduled as this is against my religion." (*Id.* at 7). Because plaintiff had previously cancelled scheduled appointments due to her claim that she did not receive a valid work code, and this was the first time she contended that a videostroboscopy was against her religious beliefs, BCN's human resources representative Ursulla McWhorter (McWhorter) contacted plaintiff on December 27, 2011 by email and U.S. mail and said:

> Per instructions from a Fit-for-duty evaluation, you have been instructed to have a videostroboscopy. Based on feedback from CompOne, Third Party Administrator of Blue Cross Blue Shield of Michigan for workers compensation and short term disability claims, you have informed them you are unable to schedule such an appointment due to your religion.
>
> I would like to meet with you to discuss this issue so that we can talk to you directly and have a clear understanding regarding your concerns. Please advise what is the best date and time for you to come to the BCN Commons Human Resources Office to meet. Please note we need to have this meeting no later than Wednesday, January 4, 2012.

(*Id.* at 9–10).

Plaintiff emailed McWhorter stating that she would not be able to meet with her until plaintiff returned to work at the conclusion of her STD leave. She was scheduled to return on January 11, 2012. (Doc. 23-37 at 2, Email Correspondence). McWhorter responded by letter and email dated January 6, 2012 which said, in part:

> Given that you have declined to meet with me to discuss your concerns, I request that you send me an explanation in writing about your concerns as to how your religion impacts your ability to schedule and/or attend a videostroboscopy. I need this information no later than close of business, Wednesday, January 11, 2012.

(*Id.* at 6). Plaintiff did not respond to McWhorter's request.

On January 11, 2012, plaintiff returned to work. McWhorter held a meeting to assess the extent of plaintiff's religious objections to undergoing a videostroboscopy. *See* (Doc. 23-38 at 2, Summary of Meeting). Plaintiff refused to discuss what her religious objections were and stated that it was a private issue. (*Id.*).

After plaintiff refused to discuss what her religious objections were, she was issued a five-day disciplinary suspension for insubordination. (Doc. 23-40, Employee Discipline Report). The facts/events section of the disciplinary report state:

> Over the past several months Shemilia Burdett-Foster has failed to keep medical appointments that have been scheduled for her through CompOne. Ms. Burdett-Foster has been very deliberately insubordinate by rescheduling, canceling and/or not appearing for numerous medical appointments that have been rescheduled for her by HR and CompOne. In October, 2011, Shemilia received a disciplinary suspension due to insubordination over the same issue. She now continues to be insubordinate by refusing to disclose her reason(s) for not scheduling or taking the videostroboscopy that is required based on her fit-for-duty evaluation. Shemellia's job requires that she speak on the telephone and make outbound calls. The videostroboscopy is required by the fit-for-duty doctor to help determine the cause of her vocal problems. Shemeilla has been told on several occasions by both ER/LR and CompOne that she must have this test completed before returning to work. Shemeilla has stated she cannot take this test due to religious reasons; however she refuses to discuss her religious reasons for not taking the test. It has been explained to her that this information is needed so that the company can determine if it is possible to make accommodations for her based on her situation.

> On 1-11-12 when asked whether she would take the videostroboscopy, Shemeilla again refused based on her religion and stated she did not want to discuss or disclose this information.

(*Id.* at 2). The five-day suspension required plaintiff to return to work on January 18, 2012, but stated that she "is expected to complete the fit-for-duty requirements and have a videostroboscopy before she returns to work." (*Id.*).

Plaintiff did not return to work on January 18. Plaintiff explained at her deposition:

Q. . . . Did you return to work when you were supposed to?

A. No.

Q. Why not?

A. Because I was so stressed out unbelievably because I felt like nobody in that company – from the union to the company to HR, nobody had my back. And I tried to take my own life because I didn't want to be here no more and I didn't want to deal with this stress that was going on day in and day out.

(Doc. 23-3 at 30, Plaintiff Dep. Tr.).

Plaintiff was absent from work for seven consecutive days. She did not ask for, nor did she receive, an extension of her STD leave.[6] BCN terminated plaintiff's employment on January 26, 2012. In a letter terminating plaintiff's employment, McWhorter wrote:

> Our records indicate you have been absent from work since January 18, 2012 through today and you have not returned after serving an unpaid suspension from January 11 through January 17, 2012 for Insubordination. Further, you have failed to personally notify management of the reason for your unscheduled absence.
>
> Therefore, this is to inform you that your employment with the company has been terminated effective today, January 26, 2012 in compliance with the Master Labor Agreement (MLA), Loss of Seniority, Article 8.11. The applicable MLA language is as follows:

---

[6] Plaintiff says that, on January 17, 2012, documentation from her counselor was sent to CompOne. However, this documentation does not say that plaintiff was disabled. Nor did plaintiff request STD leave to continue due to any disability.

10

> *"Employees shall lose their seniority and employment rights if: The employee is absent for three (3) consecutive working days without properly notifying the Company of the reasons for such absence, unless it was not reasonably possible to do."*

(Doc. 23-41, Termination Letter).

**B. Procedural Background**

Plaintiff filed a claim of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC was "unable to conclude that the information obtained establishes violations of the statutes." A right-to-sue letter was issued to plaintiff on June 25, 2012.

Plaintiff filed this action pro se on September 26, 2012. (Doc. 1).

Plaintiff retained an attorney and filed an amended complaint on February 7, 2013. (Doc. 15). A second amended complaint was filed on July 17, 2013. (Doc. 18).

Defendant filed a motion for summary judgment on September 12, 2013. (Doc. 23). Plaintiff filed a response. (Doc. 26). Defendant filed a reply. (Doc. 29). The motion is ready for decision.

### III. STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

## IV. DISCUSSION

Defendant moves for summary judgment on all four counts of plaintiff's second amended complaint. The Court addresses each claim in turn.

### A. Racial Discrimination (Counts I and II)

Counts I and II of the second amended complaint assert claims of racial discrimination under Title VII of the Civil Rights Act of 1964 and Michigan's Elliot-Larsen Civil Rights Act (ELCRA). Plaintiff abandoned these claims in her response, clarifying that "she does not claim she was terminated on the basis of her race." (Doc. 26 at 2, Pl's. Resp.). Accordingly, Counts I and II are DISMISSED.

### B. Retaliation (Count III)

Count III of the second amended complaint asserts a claim of retaliation. The second amended complaint alleges:

> 10. During her employment, Plaintiff was intimidated and harassed, and ultimately retaliated against, for complaining about a racial remark where Defendant's superior stated to Plaintiff and others at work for the Defendant that he was the "head n***** in charge", and for having a medical condition and requiring accommodations for which the Defendant regarded her as disabled.
>
> 11. The person who made the foregoing statement was Ferren Gibson.
>
> * * * *
>
> 13. Plaintiff complained of the foregoing racially charged, demeaning and derogatory statement. . . .
>
> 14. From the time that Plaintiff complained about Mr. Gibson's statement, Mr. Gibson began to harass and intimidate her, harassment by her supervisor Alfred Welgenbach escalated to an unbearable point, and eventually Plaintiff had to take a short term disability medical leave due not only to a throat/voice injury but also to severe depression caused by the aforementioned harassment.
>
> * * * *

38. Defendant retaliated against Plaintiff for having complained about Defendant's discriminatory employment practices described above.

(Doc. 18, Second Am. Compl.).

The second amended complaint does not specify whether the retaliation claim is brought under federal or state law. However, plaintiff's statement of the issues in her response brief frames the retaliation claim as a question of whether her termination was in retaliation for protected activity under either Title VII or the Americans with Disabilities Act (ADA). Therefore, this claim is analyzed applying federal law.

The Sixth Circuit recently explained the necessary elements to state a claim of retaliation under federal law: "a plaintiff must establish that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Mengelkamp v. Lake Metro. Hous. Auth.*, ___ F. App'x ___, 2013 WL 5933671, at *6 (6th Cir. 2013) (citation omitted). The following describes what is necessary for a plaintiff to show in proving a claim of retaliation:

> "A plaintiff in a Title VII or ADEA action may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Direct evidence is evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action. Instead, direct evidence "requires the conclusion that unlawful retaliation was a motivating factor in the employer's action. . . ."
>
> When a plaintiff presents only circumstantial evidence of retaliation, we examine ADEA retaliation claims under the same *McDonnell Douglas/Burdine* framework used to assess discrimination claims.

*Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (internal citations omitted).

Here, plaintiff's retaliation claim is not based on direct evidence. Therefore, she must first prove a prima facie case of retaliation based on circumstantial evidence. If the plaintiff proves a prima facie case, the burden then shifts to defendant to "provide a legitimate, nondiscriminatory reason" for its actions. *Warf v. U.S. Dept. of Veterans Affairs*, 713 F.3d 874, 879 (6th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the employer provides a nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that the decision was pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.

Plaintiff fails to establish a prima facie case of retaliation. Her failure to establish a prima facie case renders summary judgment on the retaliation claim appropriate.

Plaintiff's retaliation claim is apparently based on two different, equally unconvincing, arguments. First, plaintiff argues that she was retaliated against because she reported that one of her superiors told her that he was the head n**** in charge, and that the statement made her feel offended. She claims to have been retaliated against and harassed after reporting the alleged statement. Plaintiff's version of events, however, is wholly unsupported by the evidence. For example, none of the medical records that plaintiff attached in support of her response show that she complained to her doctors that she was being harassed at work for reporting a superior for making an inappropriate comment. In all of the correspondence between plaintiff and BCN, she never once mentioned the alleged incident with Gibson. Mere "allegation[s] unsupported by any evidence, is not sufficient to defeat a motion for summary judgment." *Riley v. Church*, 874 F. Supp. 765, 769 (E.D. Mich. 1994). In addition, as will be explained, the uncontradicted evidence in the record shows that plaintiff was twice suspended and ultimately terminated because of her

insubordination and failure to follow her employer's reasonable requests. Therefore, plaintiff fails to show a causal connection between the alleged protected activity and adverse action, a necessary element required to establish a prima facie case.

Second, plaintiff argues that she was retaliated against because of her disability–depression. The evidence shows otherwise. The undisputed record shows that plaintiff was terminated for failing to report to work after she was suspended for insubordination for the second time.

Plaintiff argues that a genuine issue of material fact remains as to why she was terminated. She says that she was disabled and could not return to work on January 18. She says that CompOne was notified of this by plaintiff's doctor on January 17. She is wrong. As defendant explains:

> As to Plaintiff's failure to return to work on January 18, 2012 following the disciplinary suspension, Plaintiff's Response disingenuously asserts that her "doctor" sent a note to Defendant on January 17, 2012 "a handwritten note" placing her on disability leave for depression. However, the notes contained in Plaintiff's Exhibit C were written by Plaintiff's counselor, Janice McCrary, and it merely states, "suggest not to return to work." Plaintiff's Exhibit C at p. 6. This is not a doctor's note placing Plaintiff on a disability leave, but merely a vague recommendation on counseling notes. Rather, the undisputed evidence reveals that neither Plaintiff nor her doctor provided Defendant or CompOne any notice of her need for a leave of absence beginning on January 18, 201[2]. Ex. 16 at p. 5. Even when Plaintiff was notified that she was terminated from employment on January 26, 2013 she failed to provide any record that would support her need for a disability leave beginning on January 18, 2013.

(Doc. 29 at 4, Def's. Resp. Br.).

In addition, even if the Court assumes that plaintiff proved her prima facie case of retaliation, defendant has offered a nondiscriminatory reason for its actions–that plaintiff failed to show up to work–and plaintiff has not shown that the decision was pretext for discrimination. Therefore, not only has plaintiff failed to prove a prima facie case, but she

also has not proffered any evidence establishing a genuine issue of material fact that defendant's stated reason for her termination was pretext for retaliation.

For these reasons, count III (retaliation) is DISMISSED. The undisputed record shows that plaintiff was terminated for cause after she failed to return to work, without explanation, after a justified suspension.

**C. Unlawful Discrimination/Hostile Work Environment (Count IV)**

In count IV, plaintiff says she was discriminated against and subjected to a hostile work environment because of her depression and vocal cord problem. She claims that instead of accommodating her disabilities, BCN discharged her. The Court disagrees. As explained above, the record makes clear that despite BCN's attempts to accommodate plaintiff every step of the way, she deliberately chose to ignore these attempts by canceling appointments and making excuses without explanation as to why she could not comply with BCN's reasonable requests. Ultimately, it was because plaintiff failed to show up to work for seven consecutive days, without explanation, that she was discharged. Therefore, her claims of unlawful discrimination and hostile work environment under the ADA fail as a matter of law.

Like the retaliation claim, where a plaintiff seeks to establish discrimination "through indirect, rather than direct, evidence, [the Sixth Circuit] require[s] the plaintiff to establish a prima facie case, followed by the familiar *McDonnell Douglas* burden-shifting." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). Indeed:

> Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination. To establish a prima facie case of discrimination under the ADA, a

17

plaintiff must show "(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability."

*Id.* (internal citations omitted).

Plaintiff has not established a prima facie case of discrimination under the ADA. As explained in the analysis of the retaliation claim, plaintiff cannot show that she was fired for anything other than her failure to report to work for seven consecutive days. Therefore, she has not established that she was discriminated against solely because of a disability. To the contrary, the record shows that all of her disabilities were accommodated. She was granted STD leave each time she requested for her depression. By her own admission, she was allowed to use the bathroom frequently when her psychiatrist recommended she be allowed to do so. When she told defendant that she had a problem with her voice, they postponed her telephone training. Ultimately, however, plaintiff was insubordinate and, failed to show up for work without explanation. She fails to establish a prima facie case of discrimination under the ADA.

Even if plaintiff had proved her prima facie case of discrimination, as explained above, defendant offered a nondiscriminatory reason for terminating plaintiff's employment–she failed to show up for work. Plaintiff did not introduce sufficient evidence to show that this reason was pretext for discrimination under the ADA. As such, count IV is DISMISSED.

## V. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment was granted.

SO ORDERED.

                                               s/Avern Cohn
                                               UNITED STATES DISTRICT JUDGE

Dated: November 14, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 14, 2013, by electronic and/or ordinary mail.

                                               S/Carol Bethel for Sakne Chami
                                               Case Manager, (313) 234-5160